**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

**CONCEPTS IN PRODUCTION, LLC**                                                  **PLAINTIFF**

**V.**                                        **NO. 1:17-CV-118-DMB-DAS**

**JUSTIN JOINER**                                                                          **DEFENDANT**

**ORDER**

This contract action is before the Court on Concepts in Production, LLC's motion for preliminary injunction. Doc. #5.

**I
Procedural History**

On August 4, 2017, Concepts in Production, LLC ("CIP"), invoking federal question and diversity jurisdiction, filed in this Court a "Complaint for Injunctive Relief and Damages" against Justin Joiner. Doc. #1. The complaint alleges that Joiner, a former employee of CIP, is in violation of a "Non-Compete and Nondisclosure Agreement" ("Agreement") he signed as a part of his employment. *Id*. at 2. Based on this alleged violation, CIP asserts claims for: (1) breach of contract; (2) breach of fiduciary duty; (3) accounting; (4) punitive damages; (5) conversion; (6) injunctive relief; (7) spoliation of evidence; (8) violation of the Defense of Trade Secret Act; (9) violation of Mississippi's Uniform Trade Secrets Act; (10) fraud; (11) intentional interference with business relations/contracts; and (12) violation of the Computer Fraud and Abuse Act.

CIP served Joiner with a copy of the complaint on August 15, 2017. Doc. #3. Approximately three weeks later, on September 5, 2017, CIP filed a motion for preliminary injunction. Doc. #5. The same day, Joiner answered CIP's complaint. Doc. #7. Joiner's answer contains two counterclaims: a claim for a declaratory judgment that the Agreement is

unenforceable, and a claim for intentional infliction of emotional distress.[1]  Joiner responded in opposition to the motion for preliminary injunction on September 19, 2017.  Doc. #11.  On September 26, 2017, CIP answered Joiner's counterclaims.  Doc. #15.

Beginning on April 4, 2018, this Court held a two-day evidentiary hearing on the motion for preliminary injunction.  Following the hearing, the Court directed the submission of supplemental briefs.  Doc. #59.  CIP filed its supplemental brief on April 30, 2018.  Doc. #62.  Joiner filed his supplemental brief on May 29, 2018.  Doc. #65.

## II
## Preliminary Injunction Standard

As a general matter, "federal law governs the procedural questions when a preliminary injunction may issue and what standards of review … apply[. However, courts] analyze the substantive legal questions under, and in light of, the relevant state's law in a diversity case."  *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 n.22 (5th Cir. 2013) (quoting *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th Cir. 2010)) (quotation marks and alterations omitted).  "[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence."  *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993).  However, "the record must nevertheless support [a] court's decision."  *Id*.

## III
## Factual Background

### A.  Three-Dimensional Printing, CIP, and the Metal X

This case deals primarily with the marketing and sale of three-dimensional ("3-D")

---

[1] Also on September 5, 2017, the Court issued CIP an order to show cause why the parties are completely diverse. Doc. #8.  CIP responded to the order on September 11, 2017.  Doc. #10.  CIP's response establishes complete diversity in this action.

2

printers. 3-D printers create three-dimensional objects by taking information produced from a computer-aided design system and laying a substance, either plastic polymer or metal, to form the shape specified. Metal 3-D printers, the type relevant here, may be used in either desktop (office) or industrial settings, and are measured by, among other things, the maximum metal density of the parts they produce.

The density of a printed object refers to the presence of defects in the material after production and is measured on a scale of 0% to 100%, with 100% representing a material free of defects. Because defects in a substance will form cracks which will grow, the density of an object is "critically important" in the aerospace, automotive, and medical industries.

CIP, located in Amory, Mississippi, sells manufacturing technology, including 3-D printers. CIP also sells computer numerical control systems, SolidWorks design software, and other engineering services to a wide variety of industries. Since 2015, CIP has sold 3-D polymer printers produced by Markforged. During the fourth quarter of 2016, CIP began selling, but not shipping, a Markforged metal printing machine known as the Metal X.

The Metal X printer is marketed for industrial environments and utilizes a process called atomic fusion, in which a part is printed in layers with metal powder and then washed and fused together in a process known as sintering. The printer has a maximum metal density of 99.7% and sells for approximately $100,000.[2] Ex. P-8.

**B. CIP's Hire of Joiner**

On March 6, 2017, CIP hired Justin Joiner to work as a sales account manager to sell "every product that CIP sells," including the Metal X, to consumers in Tennessee, Alabama, and the

---

[2] This price does not include a debinding station or sinter furnace, which together total approximately $60,000. *See* Ex. P-8.

Florida panhandle. Prior to hire by CIP, Joiner had most recently worked as a territory sales representative for GoEngineer, a Texas company offering software and ancillary services and products to design and manufacturing industries. Ex. P-16. Before GoEngineer, Joiner worked as a business development manager for ModernTech Solutions, an Alabama company which sold 3-D printers and related services, including SolidWorks. *Id*.

On the day he began his employment with CIP, Joiner executed a "Non-Compete and Nondisclosure Agreement." Ex. P-1. The Agreement provided in relevant part:

> Section II. Upon expiration or termination of this agreement and for a period of two years following employment, Justin Joiner agrees not to compete with [CIP] within a 300 mile radius of [CIP's office] located at 1208 Guy Pickle Drive, Amory, Mississippi.
>
> The non-compete clause will not apply if this agreement is terminated as a result of [CIP] violating the terms of this agreement.
>
> Competition is defined, for the purpose of this agreement, as having ownership in, being employed by, managing, consulting for or rendering services to any organization or individual that is or was a client of [CIP] during Justin Joiner's employment with [CIP] or for any other business substantially similar to or competitive with [CIP] or any of the following types of business: Sales of SOLIDWORKS or any other product offered by [CIP].

*Id*.

### C. Joiner's Training

Due to Joiner's experience in sales, he required minimal training from a "software standpoint." However, CIP provided two or three days of training on the company's internal processes, and its printer line. Additionally, Tom Higgins, CIP's president, spent several days on the road with Joiner, "doing presentations together, customer calls, sales calls, [and] cold calls …." The first trip with Higgins occurred in the first two or three weeks of Joiner's employment and involved meeting with ten to twelve potential and current customers, all of whom Higgins considered to be potential customers for 3-D printers. The second trip involved a SolidWorks

4

presentation to a customer north of Florence, Alabama, which resulted in a sale. The final trip was a visit to Panama City, Florida, for the purpose of giving a presentation on CIP's Markforged product line. CIP's engineering and technical services managers also spent time on the road with Joiner. According to Higgins, the trips were intended to introduce Joiner to customers and "to show him how we like to do business, how we sell ourselves."

Higgins testified that, on one of his trips with Joiner, Joiner stated he was in possession of the customer lists from GoEngineer and "TriTech"[3] and that he intended to use the lists to benefit CIP. According to Higgins, he rejected this offer and told Joiner that possession of such documents was illegal. Higgins also testified that this interaction caused him to "lose[] total confidence" in Joiner. Joiner, for his part, denied making such an offer and testified that Higgins never restricted his access to any information after this alleged conversation.

In addition to the training described above, Joiner was provided a list of approximately 300 potential customers, also known as "leads." CIP generates its leads from a variety of sources, including its partners, its website, purchased contact lists, and trade shows.

### D. Joiner's Employment and Resignation

While employed with CIP, Joiner marketed the Metal X "lightly." According to Joiner, the light marketing was due to the fact that, because the Metal X had not been released, he "had limited information that we could give out to customers." Thus, while Joiner was able to sell the Metal X, the machine was not deliverable. Joiner marketed the Metal X primarily to smaller companies like "C & C" machine shops.[4]

On May 15, 2017, Joiner downloaded to an external drive: (1) quotations prepared for

---

[3] Joiner did not work for a company called TriTech. *See* Ex. P-16. He did, however, work for "ModernTech Solutions (A TriMech Company)." *Id*.

[4] A C & C machine takes a block of metal and "machine[s it] down into [a desired] shape."

5

approximately a dozen businesses, of whom three or four were current CIP customers; and (2) CIP's Alabama customer list. Ex. P-13. Joiner testified he downloaded these files "to make notes and keep a backup copy and move it around … to make it easier to exchange data."

At the end of May or the first week of June 2017, Joiner began speaking with SLM about potential employment. Joiner interviewed with SLM on June 14, 2017, and received a contingent offer on June 26, 2017. On June 30, 2017, Joiner submitted to Higgins a letter stating his intent to resign on July 14, 2017. Ex. P-3. Higgins called Joiner "pretty much immediately," and Joiner told Higgins that he intended to work for Capital Equipment selling farm equipment. Higgins accepted Joiner's resignation, effective immediately.

During a July 5, 2017, exit interview, Joiner was informed of CIP's restrictions on the use of certain information, including customer contact information and customer lists. *See* Ex. P-4. At the interview, Joiner stated that he retained certain customer information on his cellular phone, but that he would delete the data. *Id*. Joiner also repeated that he planned to work for Capital Equipment selling farm equipment. *Id*.

Sometime later, Joiner deleted from the thumb drive both the Alabama customer list and the quotes.[5]

### E. Joiner's Employment with SLM

SLM Solutions North America, which is headquartered in Winsome, Michigan, sells 3-D printers primarily to the automotive, aerospace, and power generation industries, but sells to other

---

[5] Higgins testified that he retained a forensics company to review Joiner's thumb drive, and that the review "recovered" the customer list and quotations. However, Higgins could not say whether the documents were deleted prior to recovery.

Relatedly, CIP sought to introduce testimony that the forensics company recovered files from Joiner's thumb drive containing customer lists and other information from Joiner's previous employers. This Court declined to consider such testimony. While the rules of evidence are more relaxed at the preliminary injunction stage, the value of such testimony was (and is) negligible insofar as Higgins could not testify which files on the thumb drive were deleted before recovery.

industries, including universities and mechanical engineering companies. SLM sells printers which utilize a process called laser bed powder fusion. Laser bed powder fusion machines utilize a high-powered laser to:

> focus that down to a … small spot on the surface of a powder bed, so it's extremely intense that instantly melts the metal that's there. … [The machine] use[s] some type of recoater which is like a bar that pushes powder across the surface, and then [it] use[s] that laser scan … really fast back and forth across the surface to melt that powder to make it a solid piece. And then [it] drop[s] the platform down and recoat[s] again another thin layer of powder and … do it again and again over, and the layers are super thin so may be thousands of layers to make something just a few inches tall.

According to Richard Grylls, the Technical Director of SLM, SLM machines, which range in price from $400,000 to $2.3 million, can print to 100% density, but are "much" slower than the Metal X.

Joiner began to work for SLM on or about July 11, 2017. While at SLM, Joiner contacted numerous businesses, including one who appears on CIP's customer list, and one for whom Joiner prepared a quotation while employed with CIP. Joiner testified that he was a "personal friend" with his contact at the business for which he had previously prepared a quotation, and that he made the contact to ask to go to lunch. He testified that his remaining contacts were all "SLM Solutions contacts," and that he reached out to the business for the purpose of selling a SLM 3-D printer. Tr. 92–93.

In the summer of 2017, Joiner reviewed a University of Memphis request for bids for a 3-D printer. Joiner contacted the University of Memphis and informed them that SLM would not be bidding on the sale, because the request for specifications was geared toward a specific machine. Joiner, however, offered to bid on the project if the university broadened the requirements. Ultimately, Joiner submitted a bid for the project. CIP also submitted a quotation in response to the request for bids. However, Joiner testified that due to the bid's requirements for a laser system,

the Metal X would not have met the required specifications.

During his time at SLM, Joiner sold one 3-D Printer, to a metal company in Charlotte, North Carolina. According to Joiner, the Metal X would not have met the specifications for the printer requested by the Charlotte company. Joiner also traveled to at least one trade show related to 3-D printers which was also attended by representatives of CIP.

## IV
## Analysis

Under federal law, a preliminary injunction is an "extraordinary remedy." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013). A plaintiff seeking a preliminary injunction must clearly show:

> (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.

*Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 457 (5th Cir. 2017). "Failure to sufficiently establish any one of the four factors requires [the court] to deny the movant's request for a preliminary injunction." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017).

In its motion, CIP requests a preliminary injunction that:

> (a) prohibits [Joiner] from competing with [CIP] at SLM Solutions NA, Inc., or any other competitor during the pendency of the Non-Compete and Non-Disclosure Agreement; (b) prohibits [Joiner] from accessing or disclosing any trade secrets or confidential information of [CIP]; and (c) compels [Joiner] to preserve and produce any property containing trade secrets or other confidential information of [CIP].

Doc. #5 at 3–4.

### A. Enforcement of the Agreement

CIP argues that, pursuant to the terms of the Agreement, Joiner should be enjoined from

competing with CIP within 300 miles from CIP's headquarters in Amory for the two-year period following his resignation. Joiner responds that CIP cannot satisfy any of the requirements for a preliminary injunction. Because CIP has failed to show a substantial threat of irreparable injury, this Court concludes that a preliminary injunction enforcing the Agreement must be denied.

As explained above, to be entitled to a preliminary injunction, a plaintiff must clearly show a "substantial threat that he will suffer irreparable injury if the injunction is not granted." *Gee*, 862 F.3d at 457. This standard includes two inquiries, whether there is a "substantial threat" of the claimed injury, and whether the injury is irreparable. With regard, to the first inquiry, a preliminary injunction requires a showing that the claimed "irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). With regard to the harm itself, the Fifth Circuit has explained that "when the threatened harm is more than de minimis, it is not so much the magnitude but the *irreparability* that counts for purposes of a preliminary injunction. It is thus well-established that an injury is irreparable only if it cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quotation marks and citations omitted). "Because both the availability and the measure of damages are governed by state law in a diversity case, it follows that state law also governs whether certain injuries qualify as irreparable for the purposes of granting a preliminary injunction." *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013) (footnote omitted).

CIP, citing *Stephen L. LaFrance Pharmacy, Inc. v. Tallant*,[6] argues that Joiner retained the Alabama customer list and "benefited from the extensive training and contact with customers that he received … [at] CIP" and that "[t]ogether, these factors amount to the transfer of 'goodwill' to

---

[6] No. 3:97-cv-104, 1997 WL 392736 (N.D. Miss. June 25, 1997).

[SLM]." Doc. #62 at 8. It further argues, once again citing *Tallant*, that a threat of irreparable injury exists because failure to enforce the injunction would cause other sales representatives to violate their non-compete agreements.

In *Tallant*, a district judge in this district granted a preliminary injunction against a telemarketer for violating a non-compete agreement. 1997 WL 392736 at *6–7. In finding a threat of irreparable injury, the judge noted that the telemarketer's employment with a competitor served to transfer goodwill to the competitor because the former employer trained the telemarketer, and because the telemarketer used that training to create goodwill for the employer. *Id*. at *6 (citing *Taylor v. Cordis Corp.*, 634 F.Supp. 1242, 1249 (S.D. Miss. 1986)). The judge further noted that because the telemarketer retained some customers when she left for the competitor, "the goodwill [her former employer] allegedly lost was in large part goodwill associated with the defendant herself, independent of the identity of her employer." *Id*. Ultimately, the judge concluded:

> that [the plaintiff's] loss of customers, as well as any loss of profits, would be compensable in money damages; however, … one of the primary injuries to [the plaintiff] is the risk that [the plaintiff's] remaining telemarketers will not comply with the covenant not to compete if no preliminary injunction is issued. Although some of the injuries to the plaintiff by the violation of the covenant not to compete are compensable in money damages, the greater injury appears to be the failure to enforce a valid agreement for two years or more and the effect it may have on other employees who signed the same agreement. Therefore, the failure to timely enforce a valid agreement would constitute irreparable injury in this case.

*Id*.

Based on this analytical framework, *Tallant* does not stand for the proposition that an employer seeking to enforce a non-compete agreement satisfies the irreparable injury requirement merely by showing that it trained a sales representative and introduced the employee to potential customers. Rather, both *Tallant*, and the *Taylor* case on which it relied, found a loss of goodwill only where the employee sought to be enjoined actually brought customers to the alleged

10

competitor, that is, where there was evidence that goodwill was actually transferred. Here, there is no indication that Joiner took any customers from CIP with him to SLM, or is likely to do so. Indeed, a loss of customers seems particularly unlikely based on the testimony of Grylls that, based on the relative differences in cost and speed of the relevant machines, it is "unfathomable" that a customer would purchase an SLM machine when a Metal X would meet its specifications.[7] Accordingly, CIP has not shown a likely loss of goodwill, making both *Tallant* and *Taylor* inapposite. *See Apex Tool Grp., LLC v. Wessels*, 119 F.Supp.3d 599, 610 (E.D. Mich. 2015) (former employed failed to show loss of goodwill where it failed to demonstrate "that it has lost any projects or customers" or that such loss was likely to occur).

Next, while use of CIP's Alabama customer list may be sufficient to constitute irreparable harm,[8] there is simply no evidence that Joiner is in possession of the list, much less utilizing it. Joiner testified unambiguously that he deleted the data. While CIP argues this testimony is undermined by Higgins' testimony that Joiner admitted he was in possession of customer lists from his previous employer, the Court finds Higgins' account incredible in light of evidence that, following the alleged conversation, Higgins took no action to protect CIP's information from Joiner. Additionally, during his employment with SLM, Joiner has contacted just one entity on CIP's customer list, an entity which was already an SLM contact. Similarly, there is no evidence

---

[7] This is not to say that the Metal X and SLM printers are not the same "products," as that term is defined in the Agreement, or that SLM and CIP are not in competition within the meaning of the Agreement. The Court does not reach these questions here, or the related question not addressed by either party—whether the Agreement would be enforceable to the extent it would be amenable to such a broad reading. *See Henley Paper Co. v. McAllister*, 117 S.E.2d 431, 434 (N.C. 1960) (where employee only worked with "fine" paper products, non-compete prohibiting competition of all paper products was unreasonable); *Nortec Commc'ns, Inc v. Lee-Llacer*, 548 F.Supp.2d 226, 228, 231 (E.D. Va. 2008) (finding overbroad non-compete prohibiting employment "if such employment or services relates to the products or services offered by the Company"); *Mister Softee, Inc. v. Amanollahi*, No. 2:14-cv-1687, 2014 WL 3110000, at *11 (D.N.J. July 1, 2014) ("I find that the provision as written is overly broad to the extent that it prohibits both retail and wholesale sales of ice cream products.").

[8] *See, e.g., First Option Mortg. v. Tabbert*, No. 2:12-cv-600, 2012 WL 1517295, at *3 (D. Nev. Apr. 30, 2012) ("With Defendant's access to so many hundreds of Plaintiff's potential loan customers and the loss of ripple effect of referrals to be generated from potential customers monetary damages will not adequately compensate Plaintiff for its injuries.").

that Joiner retained the leads given to him by CIP or that he has, or is likely to, utilize such leads during his employment with SLM. Accordingly, the Court finds no threat of irreparable injury based on Joiner's use of customer information. *See TransUnion Risk & Alt. Data Sols., Inc. v. Challa*, 676 F. App'x 822, 825–26 (11th Cir. 2017) (affirming district court's crediting of defendant's testimony "that he has not and would not use or disclose any of [plaintiff's] proprietary information"); *see also Wessels*, 119 F.Supp.3d at 609 (no risk of irreparable harm based on proprietary information where defendant was no longer in possession of storage devices).

Finally, while Higgins testified that he was "concerned" the failure to enforce Joiner's non-compete would cause other employees to violate their non-compete agreements, there is absolutely no evidence such an occurrence is likely. This fear is insufficient to support a preliminary injunction. *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.").

In sum, CIP has failed to show that it is likely it will suffer irreparable harm from Joiner's alleged violation of the agreement. Accordingly, an injunction against such activity is unwarranted. *See Dennis Melancon, Inc.*, 703 F.3d at 280 (injunction denied where no threat of irreparable harm shown).

### B. Trade Secrets

CIP seeks an injunction prohibiting Joiner from violating the Mississippi Uniform Trade Secrets Act by disclosing information related to CIP's customers.

The Mississippi Trade Secret Act prohibits the "misappropriation" of trade secrets and authorizes an injunction for "[a]ctual or threatened misappropriation." Miss. Code Ann. §§ 75-26-5, 75-26-6. Misappropriation is defined as unauthorized acquisition or disclosure of a trade

12

secret. *Id*. at § 75-26-3. While a client list may be considered a trade secret under the MTSA,[9] the Court concludes, for the reasons above, that CIP has failed to show a threatened or actual misappropriation of its trade secrets. Accordingly, it is not entitled to an injunction under the MTSA.

# V
# Conclusion

For the reasons above, CIP's motion for preliminary injunction [5] is **DENIED**.

**SO ORDERED**, this 12th day of July, 2018.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

---

[9] *Ins. Assocs. of Lamar Cty, LLC v. Bolling*, No. 2:14-cv-97, 2014 WL 5437358, at *3 (S.D. Miss. Oct. 24, 2014).